UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| RODDIE K. STOCKTON, | Civil No. 07-556 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| JEREMY AUREN and DUANE SIEDSCHLAG, acting in their individual capacity as officers of the White Bear Lake Police Department, | |
| Defendants. | |

Robert Bennett and Ryan O. Vettleson, **FLYNN GASKINS & BENNETT, LLP**, 333 South Seventh Street, Suite 2900, Minneapolis, MN 55402, for plaintiff.

Joseph E. Flynn and Leonard J. Schweich, **JARDINE LOGAN & O'BRIEN PLLP**, 8519 Eagle Point Boulevard, Suite 100, Lake Elmo, MN 55042, for defendants.

Plaintiff Roddie Stockton brought this lawsuit against White Bear Lake Police Officers Jeremy Auren and Duane Siedschlag, alleging the officers used excessive force against him in violation of his Fourth Amendment rights. This case is before the Court on defendants' motion for summary judgment. For the reasons discussed below, the Court denies defendants' motion.

**BACKGROUND**

At the time of the alleged incident, plaintiff was fifty-seven years old and resided in a condominium unit located in a six-building complex in White Bear Lake, Minnesota.

On the evening of December 5, 2006, plaintiff received a telephone call advising him that his monthly condominium association fees were due. Condominium residents typically pay their dues by bringing a check to the treasurer's condominium unit and depositing the check in a black drop-box. Shortly after receiving the phone call, plaintiff left his home with his checkbook to make his monthly payment.

At some point, plaintiff – who suffers from periodic episodes of confusion and seizures, some of which have required hospital stays – became disoriented. Plaintiff ultimately arrived at the back door of the wrong unit behind one of the condominium buildings, still wearing his slippers. The rear area behind the building is a common area for condominium residents. The area is not frequently used, however, as it is not accessible by pathway from the front or sides of the condominium building, does not have lights, and is relatively secluded.

Plaintiff knocked on the back door of eighty-two year old resident Ruth O'Connor. O'Connor came to the door and saw plaintiff waving a piece of paper in his hand, which O'Connor assumed was a check. O'Connor told plaintiff he was in the wrong place to pay his rent and told him to go away. A short time later, plaintiff knocked once again on O'Connor's back door. O'Connor became concerned for her safety, apparently realizing that she might be alone in that particular condominium building. She called 911 at approximately 7:03 p.m. to report that someone was "trying to get in [her] back door." (Vettleson Aff., Ex. F.) A few moments later O'Connor told the dispatcher that "[h]e's knocking on the door now," and that "he's been here a half hour ago, and I sent him away." (*Id.*) The sound of knocking was audible on the 911 call, and the dispatcher

asked O'Connor if the man was trying to sell something. O'Connor responded that the man looked "kinda skuzzy," and described him as white, wearing a blue jacket, and in his forties or fifties.

Sergeant Siedschlag was in the dispatch center at the time the 911 call came in. However, Siedschlag testified in deposition that he left the dispatch center before O'Connor told the dispatcher that the suspect was knocking on her back door.[1] Siedschlag directed White Bear Police Officer Auren to respond, and broadcast over the police radio that "it sounds like a burglary in progress." White Bear Lake Police Officer Curtis Pappoovaong also responded to the call. A short time later, the dispatcher broadcast to the officers that "the party is now knocking at the door," and later broadcast a description of the suspect.

Several minutes after the 911 call was received, Siedschlag and Auren arrived at the scene in separate vehicles, with Auren arriving just after Siedschlag. Siedschlag went to O'Connor's front door. Auren went around the condominium building to the rear area, where he saw plaintiff standing near O'Connor's back door. Auren stated in deposition testimony that when he first saw plaintiff, he thought plaintiff was an "old guy" who was helping to look for the suspect, and that he was expecting to find a much younger suspect.[2] However, Auren then heard the dispatcher's description of the suspect, which substantially matched plaintiff's appearance. Auren shined a flashlight at plaintiff,

---

[1] It is unclear from the record whether the sound of knocking was audible on the 911 call prior to the time Siedschlag left the dispatch center.

[2] Plaintiff is 5'6" tall and weighed approximately 118 pounds at the time of the incident.

identified himself as a police officer, and pointed his gun at plaintiff. Auren stated that the plaintiff appeared intoxicated and disoriented. There were no signs of any forced entry at O'Connor's rear door.

Auren kept his gun trained on plaintiff and yelled four or five times for plaintiff to raise his hands. Plaintiff's hands were at his sides along his waistband and were visible to Auren. Auren testified that he was concerned that plaintiff might have a weapon. Plaintiff did not comply with Auren's orders. Auren then ordered plaintiff to turn around so that he could see plaintiff's waistline to check for weapons. Auren told plaintiff to turn around four or five times. Plaintiff did not comply with these commands, but remained motionless with his hands at his sides. Auren testified that he considered plaintiff's failure to comply with his orders to be an aggressive action, and that he was concerned that plaintiff might run away or use a weapon against him.

At this time, Siedschlag arrived in the rear area and yelled at plaintiff in rapid sequence to "get down, get down, get down on the ground." Siedschlang approached plaintiff, grabbed him by his left wrist, and placed his hand on plaintiff's left shoulder. Plaintiff did not pull his wrist away, did not try to escape from Siedschlag's grip, and did not make any aggressive moves toward the officers at any time. Siedschlag then executed an "arm-bar takedown," pulling plaintiff down to the ground on his left side. Auren testified that he pointed his flashlight at the ground and holstered his gun at the moment Siedschlag took plaintiff to the ground, so that he did not actually witness the takedown. According to Auren, he pointed his flashlight at the ground so that

Siedschlag's vision would not be obstructed during the maneuver. Following the takedown, Siedschlag and Auren handcuffed plaintiff.

Auren's police report indicated that both he and Siedschlag had taken plaintiff to the ground. Auren admitted during deposition testimony, however, that only Siedschlag had taken plaintiff down.

Plaintiff testified that he was taken down "very roughly." As a result of the takedown, plaintiff severely broke and displaced his hip, resulting in a left displaced Garden IV femoral neck fracture. It is undisputed that plaintiff suffers from osteoporosis and is prescribed calcium supplements. Following Siedschlag's takedown, plaintiff could not stand or walk. Auren ordered plaintiff to stand. Siedschlag yelled at plaintiff, "You walked here, you're going to walk to the squad car, do you understand that, one foot in front of the other." (Siedschlag Dep. at 32.) Auren stated "[a]re you that drunk that you can't stand up on your own?" (*Id.* at 33.) Auren and Siedschlag forced plaintiff to his feet and, with each officer holding one side of plaintiff, walked him to the squad car. Plaintiff said "ow" repeatedly as the officers walked him to the car. Plaintiff was unable to get into the squad car, and left his feet hanging outside the vehicle. Auren told plaintiff to "[g]et your feet in the car. You're not that drunk. Get your foot in the car." Auren then moved plaintiff's feet into the car.

Auren administered a breathalyzer test to plaintiff, which showed plaintiff had no alcohol in his system. Auren then called a paramedic for plaintiff. According to Siedschlag, they called a paramedic because they thought plaintiff had a diminished mental capacity. However, plaintiff had to be transferred to the ambulance with a

stretcher because plaintiff was unable to stand. Plaintiff alleges that the officers called the paramedic because they realized plaintiff was severely injured and could not walk.

Siedschlag did not complete an incident report or a use of force report following the incident, and did not notify his supervisor of plaintiff's injury. Plaintiff alleges that Siedschlag's failure to report the incident violated written White Bear Lake Police Department policies.[3] Plaintiff also notes that Siedschlag filed a false police report in 2003 resulting in a thirty-day suspension. Siedschlag testified in deposition that he did not believe it was "pertinent" to prepare any such reports, and that he did not notify his superiors of plaintiff's injury because "[plaintiff] gave us no indication that he was injured." (Siedschlag Dep. at 52.) Auren, on the other hand, did complete an incident report and a use of force report. Auren's use of force report stated that both he and Siedschlag had taken plaintiff to the ground, when in fact only Siedschlag had taken plaintiff down.

The takedown resulted in a complete fracture of plaintiff's hip, requiring full hip replacement surgery. Plaintiff has incurred more than $60,000 in medical bills as a result of his injury. Plaintiff was never charged with a crime as a result of this incident.

Plaintiff filed this action against defendants Auren and Siedschlag under 42 U.S.C. § 1983, alleging the officers' actions constitute excessive force in violation of the Fourth Amendment. Specifically, plaintiff alleges that the officers used excessive force by executing the arm-bar takedown and by forcing plaintiff to walk to the squad car after he

---

[3] White Bear Lake Police Procedures require an officer to complete a use of force report whenever the officer uses force, and further require an officer to immediately contact his or her supervisor if injury occurs as a result of the force. (Vettleson Aff. Ex. L, §§ IV.K.1, V.D.6.)

broke his hip. Plaintiff seeks damages for medical expenses and pain and suffering, as well as an award of punitive damages.

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate in the absence of any genuine issue of material fact and when the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II. EXCESSIVE FORCE

Plaintiff argues that the officers' actions constitute excessive force in violation of the Fourth Amendment's prohibition on unreasonable seizures.[4] *See* U.S. Const. amd. IV. The use of force is excessive under the Fourth Amendment if it is not "objectively reasonable under the particular circumstances." *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994). When considering the circumstances, courts consider factors

---

[4] Plaintiff is not challenging on probably cause grounds the officers' initial decision to seize the plaintiff.

such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Winter v. Adams*, 254 F.3d 758, 765 (8th Cir. 2001). Force that later seems unnecessary does not violate the Fourth Amendment if it was reasonable at the time, giving consideration to the fact that officers are often forced to make a "split second judgment" in a "tense, uncertain, and rapidly evolving" situation. *Graham*, 490 U.S. at 396-97. Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

Defendants first argue that the takedown was reasonable because they were responding to a "burglary in progress" call, and burglary is a serious felony. However, officers called to respond to a serious felony are not thereby entitled to ignore relevant information that emerges once they arrive on the scene. *Cf. Ngo v. Storlie*, 495 F.3d 597, 603 (8th Cir. 2007) (finding that even though officer was responding to a severe crime involving the shooting of a fellow officer, officer's observations after arriving on the scene diminished the perceived threat posed by the plaintiff). Here, several facts, viewed in a light most favorable to plaintiff, may reasonably be seen to mitigate the seriousness of the offense in question. Plaintiffs' short and stooped stature, his aged appearance, and his obviously disoriented demeanor might have led a reasonable officer to conclude that plaintiff was not in fact a burglary suspect. Indeed, Auren testified that he initially assumed plaintiff was an older resident helping to look for the suspect. It is undisputed that plaintiff was still wearing his slippers at the time of the incident, and that there were

no signs of forced entry at O'Connor's back door. Further, the record suggests that several minutes after the burglary in progress call went out Siedschlag and Auren heard the 911 dispatcher report that plaintiff was knocking at the door. These facts, coupled with the fact that plaintiff was still outside O'Connor's door when the officers arrived on the scene, may have led a reasonable officer to doubt that plaintiff was committing or had committed a serious felony.

Defendants next argue that a reasonable officer would have perceived plaintiff as posing an immediate threat to their safety or the safety of others. Defendants note in particular that the rear area behind the condominium building was dark, that they did not know whether plaintiff was carrying a weapon, and that plaintiff refused to comply with several commands. As noted above, however, plaintiff's stature and appearance, viewed in a light most favorable to plaintiff, might reasonably be seen to mitigate the perceived threat to the officers. *Cf. Ngo*, 495 F.3d at 603. Plaintiff appeared to be a small, stooped, and older man still in his bed slippers. He also appeared intoxicated and disoriented. Additionally, Auren's gun remained drawn and pointed at plaintiff throughout the encounter, while plaintiff's hands were visible at his sides. While plaintiff's intoxicated and disoriented demeanor could be perceived as threatening under certain circumstances, viewing the facts in a light most favorable to the plaintiff, as the Court must for purposes of this motion, a jury could find that plaintiff's appearance mitigated the immediate threat perceived by a reasonable officer on the scene.

Finally, defendants contend that plaintiff actively resisted arrest by refusing to comply with various commands from Auren and Siedschlag. Defendants argue that the

passive nature of plaintiff's resistance does not obviate the need for force, noting the Eighth Circuit's pronouncement in *Wertish v. Krueger* that "when a suspect is passively resistant, somewhat more force may reasonably be required." 433 F.3d 1062, 1066-67 (8th Cir. 2006). However, the resistance in cases relied on by defendants is more active than the resistance here. In *Wertish*, for example, the plaintiff led defendant-officer on a five-mile, low-speed car chase. *Id.* at 1064-65. When plaintiff finally stopped, officers approached the vehicle with guns drawn and yelled at plaintiff four times to exit the vehicle. *Id.* at 1065. When plaintiff failed to respond to these commands, the officers opened the door, threw plaintiff to the ground, and handcuffed him. *Id.* The Eighth Circuit ultimately found that the use of force was reasonable in light of the car chase and plaintiff's refusal to exit the car. *Id.* at 1066-67; *see also Foster v. Met. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (finding use of force reasonable where plaintiff refused to exit his car and clung to the car's door frame); *Schumacher v. Halverson*, 467 F. Supp. 2d 939, 951 (D. Minn. 2006) (finding use of force reasonable where plaintiff resisted arrest by pulling away from the arresting officer and then grabbing a basketball pole and refusing to let go). Further, the use of force in the passive resistance cases cited by defendants resulted in only *de minimis* injury. *See Schumacher*, 467 F. Supp. 2d at 951 (finding use of force reasonable in part because it resulted in no permanent physical injuries and did not require medical or psychological treatment); *Wertish*, 433 F.3d at 1067 (finding that the absence of permanent injury supported the conclusion that use of force was reasonable).

The Court finds that an individual's refusal to exit a vehicle that may be used as a dangerous weapon, particularly after leading officers on a five-mile car chase, constitutes more active resistance than the plaintiff's resistance in this case. *See, e.g.*, *Janis v. Biesheuvel*, 728 F.3d 795, 800 (8th Cir. 2005) (finding that force used in pulling plaintiff out of a vehicle was justified given the potential threat to public safety of an impaired driver in command of a running vehicle). Here, plaintiff remained docile throughout the entire encounter with the officers. His hands were visible at his sides, and he made no movement when Siedschlag grabbed his wrist. Considering plaintiff's disoriented appearance and the fact that plaintiff was still present at O'Connor's door when the officers arrived on the scene, his failure to respond to the officers' commands may have looked more like confusion than active resistance to arrest. Finally, the takedown resulted in a severe hip fracture requiring full hip replacement surgery, an injury of greater constitutional magnitude than the *de minimis* injuries in the cases cited by defendants. In sum, viewing the facts in a light most favorable to the plaintiff, a reasonable jury could conclude that Siedschlag's use of an arm-bar takedown may not have been reasonable in light of the severity of the crime, the threat posed by plaintiff, and plaintiff's wholly passive resistance to the officers' commands.

The Court further notes that plaintiff testified that Siedschlag took him down "very roughly." While the record shows that plaintiff suffered from osteoporosis, a reasonable jury could conclude that Siedschlag misused the takedown technique, taking plaintiff down so forcefully that he broke plaintiff's hip. *See Hagen v. Palmer*, No. 02-4318, 2003 WL 22136067, at *3 (D. Minn. Sept. 12, 2003) (stating that the "[m]isuse of a valid

policing technique can turn into unreasonable force"). Thus, even if the Court were to decide that the use of a takedown was reasonable under the circumstances, a fact issue remains as to whether the amount of force used in executing the takedown was appropriate, and whether Siedschlag misused the takedown technique causing plaintiff's hip injury.

With respect to officer Auren, plaintiff concedes that Auren's direct actions – including pointing a gun at plaintiff and yelling commands at him – do not constitute excessive force under the circumstances. Plaintiff argues instead that defendant Auren aided and abetted Siedshlag by failing to prevent the unconstitutional conduct. It is well-settled that an officer may be liable for the unconstitutional conduct of another officer for failing to intervene. *Putman v. Gerloff*, 639 F.2d 415, 423-24 (8th Cir. 1981); *Jones v. City of Minneapolis*, 2007 WL 2249132, at *11 (D. Minn. Aug. 1, 2007). Here, Auren testified that he pointed his flashlight at the ground when Siedlschlag approached plaintiff so that Siedschlag's vision would not be obstructed. Auren stated that he looked down to holster his gun at the very moment Siedschlag executed the takedown maneuver. In addition, Auren testified that at the moment he heard Siedschlag yelling at plaintiff to get down, "[he] knew [they] were going down to the ground with [plaintiff]." (Vettleson Aff. Ex. C at 62.) Viewing the facts in a light most favorable to plaintiff, a jury could

reasonably conclude that Auren was aware that Siedschlag was about to execute an unconstitutional takedown of plaintiff and failed to intervene.[5]

Finally, plaintiff argues that the officers used excessive force by requiring plaintiff to walk to the squad car despite his obviously severe hip injury. Plaintiff notes that he was able to stand prior to the takedown, that he was unable to walk or stand *after* the takedown, and that he repeatedly said "ow" as he was walked to the car. Defendants argue that they mistakenly believed that plaintiff was unable to stand because he was disoriented and intoxicated, and that they were not aware that plaintiff had severely injured his hip. The Court finds that, viewing the facts most favorably to plaintiff, a jury could conclude that a reasonable officer on the scene would have realized the extent of plaintiff's injury, and would not have forced plaintiff to walk to the squad car with such an injury. Even if the precise nature and extent of plaintiff's hip injury was not obvious to defendants at the time, plaintiff's great difficulty walking and standing, as well as his unequivocal expressions of pain during the walk to the car, support the conclusion that a reasonable officer would have been aware that plaintiff had suffered a severe leg injury. Defendants' decision to call an ambulance upon reaching the squad car is consistent with this view of the facts. While the facts may be viewed to support defendants' contention that they believed plaintiff was unable to walk because he was intoxicated, the Court

---

[5] Further, the alleged inconsistencies in Auren's use of force report filed after the incident – including Auren's statement that both he and Siedschlag took the plaintiff down to the ground – along with Siedschlag's failure to complete any police reports at all, support a reasonable inference that Auren was trying to protect Siedschlag, his superior officer, from possible disciplinary action resulting from the incident. These facts may be consistent with plaintiff's theory that Auren acted to enable Siedschlag's unconstitutional conduct.

must view all of the facts in a light most favorable to plaintiff for purposes of this motion. So viewed, the Court finds sufficient evidence in the record that would allow a jury to conclude that a reasonable officer would have been aware of plaintiff's severe injury and would not have forced him to walk to the squad car despite that severe injury.

In sum, for the reasons discussed above, the Court finds genuine issues of material fact regarding whether defendants' use of force was excessive under the circumstances.

### III.   QUALIFIED IMMUNITY

Defendants next argue that, even if there is sufficient evidence supporting plaintiff's excessive force claims, defendants are entitled to qualified immunity. Qualified immunity is a defense available to government officials who have not violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007). The defense allows officers to make reasonable errors "so that they do not always err on the side of caution." *Habiger v. City of Fargo*, 80 F.3d 289, 295-96 (8th Cir. 1996) (internal quotations and citations omitted). The Court engages in a two-step analysis to determine whether qualified immunity is appropriate. The first step is to determine whether the facts alleged, viewed in a light most favorable to plaintiff, show that the officers' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the Court finds a constitutional violation, it then asks whether the right was clearly established. *Id.* As discussed above, plaintiff has set forth sufficient facts to allow a reasonable jury to conclude that defendants violated plaintiff's Fourth Amendment rights by taking plaintiff to the ground and forcing him to walk to the squad car with a severe hip injury. Thus, the

Court must now look to whether plaintiff's constitutional right was clearly established at the time of the incident. *See id.*

"The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003) (internal quotations and citations omitted). The salient question is whether the state of the law at the time of the violation gave the officers "fair warning" that their alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The evidence, viewed in a light most favorable to plaintiff, shows that Siedschlag executed a forceful arm-bar takedown on a small, frail, and disoriented suspect who was not actively resisting arrest, and which caused a total fracture of plaintiff's hip. The evidence also shows that Auren was aware that Siedschlag was about to execute an unconstitutional takedown of plaintiff and failed to intervene. The officers then forced plaintiff to walk to the squad car despite the fact that plaintiff could not stand or walk, plaintiff's clear expressions of pain, and the likely realization that plaintiff had suffered a severe leg injury as a result of the takedown. The Court finds that, under these circumstances, a reasonable officer would have known it is unlawful to execute a forceful arm-bar takedown, and unlawful to fail to intervene to prevent such conduct. *See Hagen*, 2003 WL 22136067, at *3 (denying qualified immunity where the facts suggested defendant had misused an otherwise valid policing technique). The Court further finds that a reasonable officer would have known it is unlawful to force a plaintiff to walk to the squad car despite an obviously severe leg injury.

For these reasons, the Court concludes that defendants are not entitled to qualified immunity on plaintiff's excessive force claims. The Court therefore denies defendants' motion for summary judgment on plaintiff's claims that defendants used excessive force by taking plaintiff to the ground and by forcing plaintiff to walk to the squad car with an obviously severe leg injury.

## IV.  PUNITIVE DAMAGES

Finally, defendants argue that there is insufficient evidence to support plaintiff's claim for punitive damages. Punitive damages may be awarded in a § 1983 action when the defendant's conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Duncan v. Wells*, 23 F.3d 1322, 1324 (8th Cir. 1994) (internal quotations and citations omitted); *Hollins v. Powell*, 773 F.2d 191, 197-98 (8th Cir. 1985) (stating that punitive damages may be awarded in § 1983 actions to punish a defendant for outrageous conduct and to deter similar conduct in the future).

The Court finds sufficient evidence in the record to create a genuine issue of material fact as to whether defendants' conduct was motivated by evil intent or involved reckless or callous indifference to plaintiff's constitutional rights. As discussed above, the inconsistencies in Auren's use of force reports, and Siedschlag's failure to complete any police reports, support a reasonable inference that Auren was trying to protect his superior officer from potential disciplinary action arising from the incident. Auren's claim that he looked down at the very moment Siedschlag executed the takedown, and his statement that he "knew [they] were going down to the ground with [plaintiff]" prior to

the takedown, further supports an inference that Auren was aware that Siedschlag was going to engage in unconstitutional conduct and failed to intervene.  Finally, if the jury finds that the force of the takedown, rather than plaintiff's preexisting osteoporosis, was the primary cause of the hip fracture, it might reasonably conclude that defendants' conduct is outrageous and award punitive damages to deter similar conduct in the future.

For these reasons, the Court finds that a reasonable jury could find that defendants' conduct supports an award of punitive damages.  Accordingly, the Court denies defendants' motion for summary judgment on plaintiff's claim for punitive damages.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that defendants' Motion for Summary Judgment [Docket No. 15] is **DENIED**.


DATED:   May 5, 2008　　　　　　　　　　　　　s/ John R. Tunheim
at Minneapolis, Minnesota.　　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge